## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

No.   16 - 2268-WCT


**IN RE: SEALED COMPLAINT.**

_____/


## CRIMINAL COVER SHEET


1.    Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?    _____ Yes    __X__ No

2.    Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?    _____ Yes    __X__ No


Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:    _____

Elina A. Rubin-Smith
Assistant United States Attorney
Court ID A5501786
99 N.E. 4th Street
Miami, Florida   33132-2111
Telephone: (305) 961-9415
Facsimile: (305) 536-4676
Email: Elina.Rubin-Smith@usdoj.gov

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| ADALBERTO PEREZ, | ) | Case No.  1L - 22 6 F. uLT |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____March 1, 2015_____ in the county of _____Miami-Dade_____ in the

___Southern___ District of _____Florida_____ , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| 18 U.S.C. § 1951(a) | Conspiracy to commit Hobbs Act robbery. |
| 18 U.S.C. § 924(o) | Conspiracy to possess a firearm in furtherance of a crime of violence. |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_Complainant's signature_

BARBARA BEDFORD, FBI SPECIAL AGENT

_Printed name and title_

Sworn to before me and signed in my presence.

Date: __3/1/16__

_Judge's signature_

City and state: _____Miami, Florida_____        WILLIAM C. TURNOFF, U.S. MAG. JUDGE

_Printed name and title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Barbara Bedford, having been first duly sworn, do hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") since June of 2011. I am currently assigned to the Violent Crimes and Fugitive Task Force of the FBI's Miami Division. My duties involve the investigation of a variety of violent crimes, including bank robberies, Hobbs Act robberies, and extortion.

2. This affidavit is in support of a Criminal Complaint and Arrest Warrant for ADALBERTO PEREZ for violations of Title 18, United States Code, Sections 1951 (conspiracy to commit Hobbs Act robbery) and 924(o) (conspiracy to possess a firearm in furtherance of a crime of violence). The information contained in this affidavit is based in part on information developed by other Special Agents of the FBI, as well as other law enforcement officers, and civilian witnesses. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not contain all of the information known to me and/or other law enforcement officers involved in this investigation.

## PROBABLE CAUSE

### March 1, 2015 Highway Robbery of Gold Bars from Tractor Trailer

3. On March 1, 2015, at approximately 6:50 p.m., an armed robbery of a tractor trailer was reported to the Wilson County, North Carolina Sheriff's Office. This robbery occurred on the north bound lanes of Interstate 95 near the 114 mile marker in Wilson County, North Carolina. The tractor trailer, which departed from the Miami, Florida area and was headed to the Bridgewater, Massachusetts area, was hauling precious metals consisting of gold and silver. The

1

majority of this gold and silver was being transported in bulk form and was intended for processing in the Bridgewater, Massachusetts area. The tractor trailer was occupied by a driver and passenger, who were both employees of TransValue, Inc., a shipping company based out of Miami, Florida.

4.      Upon entering Wilson County, North Carolina, the driver and passenger suddenly began to feel sick. As a result, the driver pulled the tractor trailer onto the shoulder of Interstate 95 so that the passenger could vomit. Once the passenger was out of the trailer, three unknown Hispanic male subjects pulled in behind the trailer in a white van. They placed traffic cones close to the TransValue trailer. All three robbers spoke in Spanish and identified themselves as "Policia" (translation: "Police"). Two of the robbers, who were armed with handguns, then bound the driver and the passenger's hands behind their backs and took control of the tractor trailer. The third robber cut off the locks to the doors of the trailer, opened the doors of the trailer, and offloaded multiple five-gallon buckets containing approximately 275 pounds of gold bars and approximately 40 silver stamped plugs (resembling coins). The robbers then ordered the driver and passenger into the woods beyond the shoulder of Interstate 95, loaded the gold and silver into their white van, and fled the scene. Once the subjects fled the scene, the driver and passenger proceeded from the woods to the shoulder of Interstate 95 and flagged down passing motorists for assistance. According to the driver and passenger, it appeared that the robbers knew where to find the containers with the gold, as they ignored a number of other 50-gallon drums containing silver.

5.      The total value of the gold bars stolen by the robbers has been estimated at approximately $4,800,000. The gold belonged to Republic Metals Corporation, based out of Opa Locka, Florida, and each bar bore a unique identifying stamp and number.

6.      Republic Metals Corporation and TransValue are engaged in interstate commerce.

### *Recovery of One Gold Bar and Prosecution of Miguel Bovar*

7.      On April 9, 2015, G.M. attempted to sell a large gold bar bearing the seal of Republic Metals to NTR Metals, a precious metals refinery located in Doral, Florida.  NTR Metals refused to accept the gold bar and contacted the FBI to report this incident.  While the FBI was en route to NTR Metals, G.M. returned to NTR Metals with a smaller piece of gold.  FBI questioned G.M., who stated that the gold had been given to him to sell by a Venezuelan man whose name G.M. did not know.

8.      During the search of G.M.'s residence, FBI recovered a gold bar bearing the seal of Republic Metals, and containing a unique identifying number matching one of the gold bars stolen during the March 1 robbery.  The gold bar appeared to have been cut by a hand saw, chisel and hammer, all of which were located in the residence during the search.  G.M. admitted that he had used the saw, chisel and hammer to cut off approximately one quarter of the gold bar.

9.      Subsequently, G.M. and his family started to receive threats, both in person and over the telephone, in reference to the gold bar that FBI seized from G.M.

10.     G.M. identified a photograph of Miguel Bovar as the individual who had previously given him the gold bar.

11.     Miguel Bovar was arrested and a federal complaint was filed on April 20, 2015 (case number 15-mj-02532-WCT).

12.     A federal grand jury in the Southern District of Florida returned an indictment against Miguel Bovar on May 1, 2015, charging him with one count of conspiracy to commit Hobbs Act extortion, one count of attempting to commit Hobbs Act extortion, and three counts of interstate transmissions of an extortionate threat to injure (case number 15-cr-20321-BB).

13.    On July 7, 2015, Miguel Bovar pled guilty to Count Two of the Indictment, which charged him with attempted Hobbs Act extortion and aiding and abetting, in violation of Title 18, United States Code, Sections 1951(a) and 2.  On September 22, 2015, Bovar was sentenced to 41 months' imprisonment.

### A Cooperating Source Comes Forward in January 2016

14.    On approximately January 21, 2016, the FBI received information from a cooperating source ("CS"), who identified Adalberto PEREZ as the person who planned and organized the March 1, 2015, robbery of the gold bars.  According to CS, PEREZ told CS that he committed the robbery with two other males approximately three days after the robbery occurred.[1]  After the robbery, CS and PEREZ had a series of conversations about the robbery.  CS stated that CS was not present during the robbery.

15.    CS had a close, personal relationship with PEREZ from approximately 2014 to approximately December 2015, and spent a considerable amount of time with PEREZ at his residence in Opa Locka, Florida.

16.    FBI confirmed that the address CS provided for PEREZ is listed as PEREZ's address in Florida's Driver and Vehicle Information Database.  Electricity service for the residence with Florida Light and Power (FPL) is in PEREZ's name.  The Miami-Dade Property Appraiser lists PEREZ as the owner of the residence.

17.    According to CS, after the robbery, PEREZ told CS that he was planning the robbery of the gold bars for approximately one year.

---

[1] Press releases referencing the gold robbery began as early as March 2, 2015.

4

18. According to CS, before the robbery, PEREZ told CS that he was expecting a package at a residence affiliated with CS. PEREZ instructed CS to bring him the package. Some time before the robbery, CS received a small package in PEREZ's name, which CS gave to PEREZ. After the robbery, PEREZ told CS that he purchased "technology" with a stolen credit card, which he had shipped to the residence affiliated with CS. PEREZ said he placed this "technology" under the TransValue trailer in order to track its location.

19. FBI investigation revealed that in February 2015, a package was shipped to the aforementioned residence affiliated with CS from a company that sold GPS tracking devices. According to records provided by the company, the tracking device that was shipped to the aforementioned residence affiliated with CS was activated in February 2015. The device was associated with a specific customer name (not PEREZ). FBI investigation to date has not found any connection between this customer name and the residence affiliated with CS.

20. According to CS, after the robbery, PEREZ told CS that he and the robbers also placed a pepper spray in the TransValue trailer, and PEREZ could initiate the pepper spray remotely, which would make the TransValue employees sick. As explained in paragraph 4 above, the TransValue trailer made a stop immediately prior to the robbery because the occupants of the trailer started to feel ill. Once the trailer was stopped, PEREZ told CS that the other two armed robbers bound the driver and passenger of the trailer while PEREZ cut the lock in order to offload the gold. PEREZ told CS that he was armed with a gun during and after the robbery. PEREZ also said that he wore reflective clothing during the robbery in order to look like a service worker. Witnesses at the scene of the robbery said that the robbers placed traffic cones close to the TransValue trailer.

21.     According to CS, PEREZ told CS that while driving away from the scene of the robbery, one of the robbers threw out a tablet, the "technology," and PEREZ's cellular telephone from their van. PEREZ purchased a new cellular telephone but kept the same telephone number.

22.     PEREZ told CS that he and the other two robbers split the ten gold bars equally.

23.     CS told law enforcement that after the robbery, PEREZ purchased a Toyota Tacoma truck from one of the other robbers. CS did not know the name of this individual. A review of the Florida Department of Highway Safety and Motor Vehicles database reveals a sale of a Toyota Tacoma truck (VIN 3TMJU4GN8CM132846) from identified COCONSPIRATOR 2 to PEREZ in April 2015.

24.     Following the robbery, one of the TransValue employees worked with law enforcement to create composite drawings of the two gunmen. The FBI has compared these composite drawings to a photograph of COCONSPIRATOR 2. The composite of one of the two gunmen is consistent with that of COCONSPIRATOR 2.

25.     Approximately in March of 2015, PEREZ showed CS one of the gold bars in the living room of his residence. CS touched the bar and felt that it was heavy.

26.     CS stated that PEREZ chipped away gold pieces from the gold bars and started selling the gold pieces in approximately April/May of 2015. CS told law enforcement that CS witnessed PEREZ attempting to use various hand tools in order to chip away smaller pieces from the gold bars for sale. In order to sell the gold, PEREZ would first call someone and ask for the current price of gold. He would then cut about four pieces of gold and weigh them on a scale in his kitchen, write down the weight in a small notebook, and package the gold. PEREZ would then make a phone call before leaving his residence. PEREZ would leave in his vehicle with the gold pieces for approximately 30 to 60 minutes and return with a large amount of money.

6

27. According to CS, an individual melted and sold the gold for PEREZ. CS said that PEREZ had this individual's phone number saved in his cellular telephone, and provided that phone number to FBI. According to CS, this individual also sold PEREZ the three Nissan vehicles that PEREZ purchased after the robbery, as described below.

28. Based on subsequent investigation, FBI believes it has identified this individual, referred to herein as PERSON 1. To date, FBI has been unable to confirm that PERSON 1 sold PEREZ the Nissan vehicles. Phone records obtained by FBI show that the phone number associated with PERSON 1 was in contact with PEREZ approximately 96 times between April and November 2015. Phone records obtained by FBI also show that, in February 2016, the phone number associated with PERSON 1 was in contact with a phone number subscribed to PERSON 2, who law enforcement believes resides with COCONSPIRATOR 2 in Miami.

29. According to CS, after the robbery, PEREZ told CS that he sold all of the gold he kept from the robbery. According to CS, PEREZ stored money from the sale of the gold bars throughout his residence, including inside a safe. CS stated that PEREZ kept the silver plugs at his residence.

30. According to CS, PEREZ advised CS that he stored two of the firearms that were used in the robbery at his residence.

31. During an interview with FBI, CS provided the FBI with one silver stamped plug (resembling a coin), which CS stated PEREZ had given to CS after the robbery. PEREZ told CS that this silver plug and others like it were contained in plastic tubes inside the TransValue trailer. This information is consistent with information provided by Republic Metals about the silver plugs. Republic Metals stopped manufacturing this particular plug in August/September of 2015.

32.     CS showed the FBI photographs CS took with a cellular telephone of items inside PEREZ's residence.  The photographs depict the following items: the hand tools and gloves PEREZ used to cut the gold bars; the scale PEREZ used to weigh the gold; one gold bar; a framed photograph of PEREZ; a bulk amount of cash PEREZ received from selling the gold bars; silver plugs taken during the robbery.  FBI confirmed that the gold bar photographed by CS contained a marking from Republic Metals and a serial number matching the serial number of one of the ten bars taken during the robbery.

33.     CS told law enforcement that PEREZ made many purchases with the proceeds from the gold robbery, including three homes.  FBI investigation to date reveals that PEREZ purchased at least two residences following the gold robbery.  One was purchased in July 2015 for approximately $90,000, and was paid off in full in October 2015.  Another residence was purchased in October 2015 for approximately $118,000, and to date, there is no recorded mortgage reported in public records for this residence.  CS was shown photographs of these properties and identified both as being purchased by PEREZ following the robbery.

34.     CS told law enforcement that PEREZ also purchased a boat and three Nissan vehicles with the proceeds from the gold robbery.  The vehicles were bought for CS, PEREZ's daughter and PEREZ's son.  FBI investigation to date reveals that PEREZ purchased a boat for approximately $7,500.00 in July 2015 (VIN GSSNH018H405).  CS was shown a photograph of the boat and identified it as one that PEREZ purchased after the robbery.  In addition, according to State of Florida Department of Highway Safety and Motor Vehicles, PEREZ was recently the insured party on two Nissan vehicles.  One vehicle belongs to PEREZ's son and the other belonged to CS before it was sold in December 2015.

35.     CS stated that PEREZ had some of the stolen gold made into jewelry, to include a bracelet, a chain, and a medallion with Saint Barbara.  CS saw the jewelry at PEREZ's residence. CS gave the FBI a yellow bracelet with an emblem, which CS said PEREZ made from one of the gold bars and gave to CS.  FBI confirmed that the bracelet was made of gold, among other materials.

36.     FBI obtained historical cell site records for a cellular telephone number that the CS provided for PEREZ.  Subscriber records from T-Mobile show that this cellular telephone number has been registered to PEREZ as early as February 2015.  On March 1, 2015, the day of the robbery, historical cell site records for PEREZ's cellular telephone show travel northbound from Florida to South Carolina.  These records are consistent with the historical cell site records obtained for the cellular telephone of one of the TransValue employees, suggesting that PEREZ and the TransValue trailer were on the same approximate route to the location of the robbery. The records for PEREZ show that the last phone activity prior to the robbery occurred in the area of Dillon, South Carolina, which is where the TransValue trailer last refueled prior to the robbery.  The robbery occurred in North Carolina, approximately one to two hours after the refueling.  The cell site records for PEREZ's cellular telephone show resumed activity on March 2, 2015, one day after the robbery, in the Miami area.

## CONCLUSION

37.    Based on these facts, there is probable cause to believe that, starting as early as March 2014 until approximately March 1, 2015, in Miami Dade County, in the Southern District of Florida, and elsewhere, ADALBERTO PEREZ did conspire to knowingly and unlawfully commit a Hobbs Act robbery, in violation of Title 18, United States Code, Sections 1951(a) and did conspire to possess a firearm in furtherance of a crime of violence, in violation of Title 18, United States Code, Section 924(o).


**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Special Agent Barbara Bedford
U.S. Department of Justice
Federal Bureau of Investigation


Sworn and subscribed before me this ___1___ day of March, 2016, in Miami, Florida.

_____
THE HONORABLE WILLIAM C. TURNOFF
UNITED STATES MAGISTRATE JUDGE

10